Filed 9/19/25

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| CHLOE E. BROCKMAN, | C101451 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CV-UMM-2023-0001612) |
| v. | |
| KAISER FOUNDATION HOSPITALS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Robert T. Waters, Judge. Affirmed.

Gibson, Dunn & Crutcher, Julian W. Poon, Lauren M. Blas, Ryan Azad, Jen Xue; Marion's Inn, Yvonne M. Pierrou; Cooley LLP and Kathleen R. Hartnett for Defendants and Appellants.

Dhillon Law Group, Harmeet K. Dhillon, John-Paul S. Deol, Jesse Franklin-Murdock; LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, Jeffrey M. Trissell, and Robert Weisenburger for Plaintiff and Respondent.

1

In this medical malpractice action involving gender-affirming care provided to an adolescent female, defendants Kaiser Foundation Hospitals (Kaiser Hospitals) and others (collectively, defendants) appeal from the order denying their petition to compel arbitration. Defendants argue the trial court erred in concluding that they failed to carry their burden to establish the existence of a valid agreement to arbitrate the controversy. As we will explain, we disagree and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties and Health Care Plans*

Plaintiff Chloe E. Brockman, a biological female, was born in 2004. As a child and adolescent, she suffered from various mental health issues including, but not limited to, social anxiety, depression, body dysmorphia, gender confusion, and "autism spectrum symptoms."

In November 2004, Kaiser Hospitals hired plaintiff's mother as a nurse. Because plaintiff's mother was a member of the California Nurses Association (CNA) union, she was eligible for health care benefits under a group health care plan offered by Kaiser Foundation Health Plan, Inc. (KFHP), a non-profit California public benefit corporation and licensed health care service plan under the Knox-Keene Health Care Service Plan Act of 1975. (See Health & Saf. Code, § 1340 et seq.)[1]

In December 2004, plaintiff's mother became a member of her union's health care plan by signing a one-page enrollment form, which contained an arbitration disclosure statement. Shortly thereafter, in January 2005, plaintiff's mother signed another one-page enrollment form (change-of-beneficiary form),[2] adding plaintiff as a dependent under her health insurance. This form also included an arbitration disclosure statement.

---

[1] Undesignated statutory references are to the Health and Safety Code.

[2] We recognize the 2005 form is sometimes referred to in the record as a change-of-beneficiary form. For purposes of this appeal, we refer to it as an enrollment form.

Notably, while both disclosure statements indicated that (with limited exceptions) the arbitration provision applied broadly to any alleged violation of any duty arising out of or related to membership in the health plan (2004 enrollment form) or service agreement (2005 enrollment form), including "any claim for medical or hospital malpractice," one of the disclosures (2004 enrollment form) stated that the "full" arbitration provision was contained in a separate document--the evidence of coverage document--while the other disclosure (2005 enrollment form) indicated the same by specifically referencing a separate document and certain policies--the service agreement and "Health Plan policies."

Approximately 15 years later, in July 2020, after plaintiff's mother transferred to a nonunion position with Kaiser Hospitals, she used the online enrollment process to enroll herself and plaintiff as members of a self-insured (self-funded) health care plan--the Kaiser employee medical health plan.[3]  Like the earlier enrollment forms (2004 and 2005), the online enrollment process included an arbitration disclosure statement indicating that (with limited exceptions) the arbitration provision applied broadly to any dispute alleging a violation of any duty relating to or arising from a relationship to any of the Kaiser Permanente parties (e.g., KFHP, Kaiser Hospitals) as a participant in the medical plan, including "any claim for medical or hospital malpractice."  The disclosure specifically stated that the "full" arbitration provision was contained in a separate document--"the Evidence of Coverage and/or the Summary Plan Description."

---

[3]  This health care plan is sometime referred to in the record as the KEMH plan.  In this opinion, we refer to it as the self-funded plan.  Self-funded health care is a self-insurance arrangement whereby an employer (e.g., Kaiser Hospitals) provides health benefits to employees (e.g., plaintiff's mother) using the company's own funds.  The employer, not an insurance company, directly pays the health care claims of its employees.  Instead of paying monthly premiums to an insurer, the company uses its own funds to cover health care costs as they arise.

From 2005 to 2023, plaintiff and her mother were continuously enrolled as members of the KFHP, which furnished health care to its members and their dependents in accordance with the terms of written agreements. During this time period, KFHP contracted with Kaiser Hospitals to provide or arrange for hospital services to members of the KFHP. KFHP also contracted with The Permanente Medical Group, Inc. (Medical Group) to provide or arrange for health care services to KFHP members.

*Gender-Affirming Medical Care*

From 2017 to 2020, when plaintiff was between the ages of 13 and 17, she received a range of medical treatment related to gender transition that was aimed at helping her align her physical and emotional life with her gender identity. These medical services--referred to as gender-affirming care--were provided to treat a condition known as gender dysphoria. The services began after plaintiff, at age 12, informed her parents that she identified as male rather than female and her doctors "immediately affirmed" her "self-diagnosed gender dysphoria." Plaintiff, however, did not experience any psychological relief from the "gender dysphoria treatment" she received. Instead, her mental health declined and she became suicidal following her breast removal surgery at age 15.

*Pleadings*

In February 2023, plaintiff filed the instant medical malpractice action against various defendants, including two doctors, a psychologist, Kaiser Hospitals, and the Medical Group. A first amended (operative) complaint was filed in July 2023, which added two psychologists as defendants.

As for the entity defendants, Kaiser Hospitals was the hospital network through which the individual defendants (doctors and psychologists) provided gender-affirming care to plaintiff. The Medical Group, a licensed health care service plan, had entered into contracts with the KFHP for the provision of health care services to KFHP members, including plaintiff, and thus was the entity through which those medical services were

4

provided to plaintiff. All of the defendant doctors and psychologists were employed by the Medical Group.

The medical malpractice claims alleged in the operative complaint are predicated on the theory that plaintiff received treatment (gender-affirming care) that was not medically justified, and that her medical providers failed to adequately explain the risks and harms associated with that treatment.[4] In addition to failing to perform a proper psychological evaluation and disclose the risks and harms associated with the treatment, the operative complaint alleges that plaintiff's medical providers engaged in fraudulent, oppressive, and malicious conduct by giving her incorrect/false information about suicide risk and by reinforcing her erroneous belief that gender transition services would resolve her mental health issues. According to plaintiff, her medical providers failed to meet the standard of care as to their evaluation, diagnosis, and treatment of her. Additionally, plaintiff asserts that her medical providers failed to meet the standard of care with respect to obtaining informed consent for the treatment she received.[5] As a result of the alleged medical malpractice, plaintiff asserts that she "has deep physical and emotional wounds, severe regrets, and distrust of the medical system." Plaintiff further asserts that she has "suffered physically, socially, neurologically, and psychologically," including "mutilation to her body and lost social and physical development along with her peers . . . at key developmental milestones that can never be regained."

---

[4] The operative complaint alleges that plaintiff's gender dysphoria "was not persistent and resolved when she was close to reaching adulthood." As a result, "she detransitioned and no longer identifies as a male."

[5] As for the Kaiser entity defendants (Kaiser Hospitals and the Medical Group), the operative complaint alleges that they failed to supervise and train treatment providers in their provision of medical care to plaintiff and breached their duty to "adequately select, maintain, and ensure the competence" of those providers as well as to establish appropriate policies and procedures.

*Petition to Compel Arbitration*

In October 2023, defendants filed a petition to compel arbitration. They asserted that such relief was warranted because, at the time of the alleged medical malpractice, plaintiff was a dependent under her mother's health care plans, one of which was a group plan (2017-2020) offered to mother through the CNA union, and the other a self-funded plan (2020-2023) offered to mother by her employer Kaiser Hospitals. In support of their position, defendants relied on the arbitration provision set forth in the evidence of coverage portion of the 2017 membership agreement for the CNA union group health care plan as well as the arbitration provision set forth in the 2020 Kaiser Employee Medical Health Plan Summary Benefits Booklet (Benefits Booklet) for the self-funded plan. According to defendants, the relevant health care membership agreements included a broad arbitration provision, which required mother and any dependent to resolve all claims against defendants through final binding arbitration, including "any claim for medical or hospital malpractice." As evidence of an agreement to arbitrate the controversy (i.e., the medical malpractice claims), defendants attached numerous exhibits to a declaration filed in support of their petition to compel arbitration, which spanned more than 500 pages.[6]

As part of their petition, defendants noted that plaintiff had been continuously enrolled as a dependent under her mother's health care plans from 2005-2023. With respect to the two different types of plans at issue, defendants explained that when plaintiff's mother transferred to a nonunion position with Kaiser Hospitals in July 2020, she used the online enrollment process (which included an arbitration disclosure statement) to enroll herself and plaintiff in a self-funded plan offered by Kaiser Hospitals. According to defendants, the terms and conditions relating to health care coverage under

---

[6] The declaration was executed by Maryann Lombardo, "Senior Director, Benefits Compliance and Governance at Kaiser Permanente."

6

this plan, including the arbitration provision, were set forth in the Benefits Booklet. Defendants further explained that, prior to July 2020, plaintiff was enrolled as a dependent under her mother's CNA union health care plan, which included an evidence of coverage document containing the terms and conditions applicable to those enrolled under the agreement, including the "full arbitration provision."

Plaintiff opposed the petition, arguing that the arbitration provisions defendants were relying on were not enforceable for two primary reasons:  (1) the 2005 and 2020 health plan enrollment forms did not satisfy the "prominent display" arbitration disclosure requirement set forth in section 1363.1; and (2) the 2004 and 2005 health plan enrollment forms did not contain arbitration disclosure language required by section 1363.1 and Code of Civil Procedure section 1295; specifically, language disclosing that "negligently and incompetently rendered medical services" are subject to binding arbitration.

Plaintiff did not dispute that her mother signed the 2004 and 2005 enrollment forms for the CNA union health care plan.  Nor did plaintiff dispute that her mother completed the online enrollment process for the 2020 self-funded health care plan. However, plaintiff disputed that there was a valid, legally binding agreement between the parties to arbitrate the controversy.

In reply, defendants argued that plaintiff's contentions had no merit because "(1) the preemption provision of the federal Employee Retirement Income Security Act ('ERISA') preempts Section 1363.1 here, and (2) the [arbitration] disclosures in the three forms [(i.e., the 2004, 2005, and 2020 health care enrollment forms)] comply with Section 1363.1."

In a court-ordered supplemental brief, defendants addressed the implications of two recent California appellate court decisions, identified the specific arbitration provisions in the record that, in their view, required arbitration of the controversy, and explained why the "operable" arbitration agreements were enforceable under ERISA and

7

California law. Among other things, defendants made clear that they were attempting to enforce the arbitration provisions included in *each* of the one-year group health care membership agreements (set forth in evidence of coverage document) under which plaintiff was enrolled through her mother's union from 2017-2020, *and* the arbitration agreement included in the one-year health care membership agreement (set forth in the Benefits Booklet) under which plaintiff was enrolled through her mother's self-funded health care plan (2020), which they claimed contained largely identical language. In response to the trial court's request to identify "where in the evidence the [arbitration] agreements and terms can be found," the defendants directed the court to specific portions of the voluminous materials they submitted in connection with their petition to arbitrate.

Plaintiff filed a response to the supplemental brief and defendants filed a supplemental reply brief, the latter of which is not included in the appellate record.

*Trial Court's Ruling*

In April 2024, after a hearing, the trial court issued a written order denying the petition to compel arbitration. The court found defendants had failed to satisfy their burden to establish the existence of a valid agreement to arbitrate the controversy. In so finding, the court initially addressed the 2020 self-funded health care plan. The court began its analysis by pointing out that defendants were relying on the arbitration provision set forth in the "Benefits Booklet." After block quoting language from the electronic enrollment form that plaintiff's mother completed to become a member of the 2020 self-funded health care plan, the court explained, in relevant part, as follows:

"[O]n January 26, 2024, this court ordered Defendants to specifically state which arbitration agreement they are seeking to enforce. . . . In . . . their supplemental brief . . . Defendants responded in bold-print stating they seek to enforce the arbitration provision 'in the Benefits Booklet for the self-funded plan' . . . . Notably, the full arbitration provision that Defendants seek to enforce—i.e., the January 2020 Benefits Booklet . . . is

8

*not* referenced in the above-quoted plan enrollment message [i.e., the electronic enrollment form mother completed in 2020]. Instead, it refers explicitly to the 'the full arbitration provision' in the 2020 'Evidence of Coverage' and/or a 'Summary Plan Description[.]' . . . As Defendants concede[,] . . . 'the full arbitration provision' they seek to enforce . . . is not contained in the 'Evidence of Coverage' or the 'Summary Plan Description' but in a completely different document—the . . . 'Benefits Booklet[.]' . . . In short, Defendants failed to meet their prima facie burden. Defendants offered no evidence Plaintiff in her individual capacity or through her mother agreed to the full arbitration agreement set forth in the 'Benefits Booklet[.]' . . . The 'Summary Plan Description' and the 'Benefits Booklet' are distinctly separate documents; even Defendants itemize the documents as independent exhibits in their moving papers. This court shares the sentiments expressed in the Court of Appeal's footnote 4 of *Baglione v. Health Net of California, Inc.* (2023) 97 Cal.App.5th 882—the enrollees and the court should [not] be required to scour the various booklets for more information. Here, absent direction from Defendants, this Court was unable to locate the full arbitration agreement in question. It was not in either document referenced in the 2020 electronic enrollment message. No evidence of Plaintiffs agreement to arbitration under terms of the 'Benefits Booklet' has been offered. Defendants failed to meet their prima facie burden of establishing the existence of an agreement to arbitrate under the July 2020 self-funded plan." (Boldface omitted.)

Next, the trial court considered defendants' alternative contention that arbitration was required "under the 'traditional union plan' allegedly in effect through June 30, 2020." After noting that defendants specifically identified certain portions of the record that they claimed contained evidence of an agreement to arbitrate for the years 2017-2020, the court quoted (at length) language from the most recent of those union plans, which was set forth in the 2020 evidence of coverage document. The court then stated: "While the terms of the above agreement may be valid in that they do not run afoul of

9

any applicable state or federal law, this Court is nonetheless faced with the same fundamental problem noted above. There is no evidence that Plaintiff actually agreed to them."

The trial court went on to explain that while defendants relied on the arbitration disclosure statement included in the one-page enrollment form plaintiff's mother signed when she enrolled herself in the CNA union health care plan in 2004, that provision specifically noted that "the full arbitration provision" was contained in the "Evidence of Coverage" document, which defendants did *not* provide to the court. The court further explained that while defendants also relied on the one-page enrollment form the mother signed in 2005 (which added plaintiff as a dependent under her mother's union health care plan), the relevant language of which stated that the mother was agreeing to arbitrate any claims that assert violations of any duty arising out of or relating to the "Service Agreement" and to abide by the provisions of the "Service Agreement and Health Plan policies," none of these referenced documents were submitted to the court. The court added that, although defendants "cite the 2004 and 2005" enrollment forms "as a basis for enforcing the 2017, 2018, 2019, and 2020 union-plan arbitration agreements attached to th[eir] motion," defendants failed to adduce evidence showing that they provided plaintiff or her mother with notice of these agreements.

In concluding that defendants had failed to meet their prima facie burden to establish the existence of a valid agreement to arbitrate the controversy, the court reasoned as follows:

"Here, Defendants failed [to satisfy their burden] in seeking to enforce arbitration agreements from 2017, 2018, 2019, and 2020, by citing as evidence of Plaintiff's consent alleged agreements to arbitrate signed by Plaintiff's mother in 2004 and 2005 *specifically* referencing arbitration agreements in effect in 2004 and 2005—that is, approximately 13 to 16 years ago. Notably, the 2004 and 2005 agreements are not included with this motion/petition, and based upon Defendants' representations and exhibits attached to

10

their motion, the language of the 2004 and 2005 arbitration agreements has since changed.  [Citation.]  Moreover, in the wake of the 2004 and 2005 agreements discussed above, there is also no evidence or explanation as to how, why, or if the Plaintiff's mother's union could somehow bind Plaintiff to the 'future arbitration agreements' (i.e., the 2017, 2018, 2019 and 2020 agreements) Defendants seek to enforce by this motion/petition.  As an example, what Defendants describe as the 'Group Agreement' effective January 1, 2017 through December 31, 2017 between Plaintiff's mother's union and Defendants is not signed, [citation].  Defendants failed to present any other evidence or argument of consent beyond a quick statement by counsel during oral argument that proceeding under at 'Group Agreement' without a signature is 'common practice'—that is, the Group could accept by payment of premiums.  [Citation.]  However, there is no evidence to support this is what actually happened here."[7]

Because defendants failed to satisfy their initial burden to establish the existence of a valid agreement to arbitrate the controversy, the trial court did not address "ERISA preemption" or any other issue raised by the parties (e.g., whether the arbitration disclosure requirements of California law (i.e., section 1363.1) had been satisfied).

*Motion for Reconsideration*

In May 2024, defendants filed a motion for reconsideration, arguing that such relief was warranted based on new or different law, circumstances, and facts.  Among other things, defendants claimed that federal law (ERISA, Federal Arbitration Act (FAA)) governed whether a person was enrolled in the health care plans at issue, that new

---

[7]  At the hearing, defendants' counsel stated, in relevant part, as follows:  "It doesn't matter that the [CNA] union did not sign the renewed agreement.  The signature page expressly states that it can be accepted by signature or payment of premiums. . . .  [¶] This is standard in the industry.  Employer groups often do not sign renewals. . . .  [¶] There was definitely an agreement in place.  After all, it was pursuant to those 2017 through 2020 agreements and evidence of coverage, which are incorporated into those agreements, that plaintiff received the care in question she is now suing about."

case law held that a member of an employer-group agreement (e.g., the CNA union health care plan) agreed to by their employer is bound by all plan documents including arbitration provisions, and that plaintiff's mother was bound by the terms of the arbitration provision in the self-funded plan under ERISA.

Plaintiff opposed the motion, arguing that there were no new facts or law to warrant reconsideration. Defendants filed a reply.

The trial court, after a hearing, denied defendants' motion, finding that there was no basis (new law or facts) to justify reconsideration of the order denying defendants' petition to compel arbitration. In so ruling, the court (among other things) rejected defendants' complaint that they lacked sufficient time to address the tentative ruling, explaining that defendants "never requested additional time to address [it]" or "leave to amend to supplement their [petition to compel arbitration] prior to submitting the matter to the court" for a final decision.

*Appeal and Appellate Briefing*

Defendants filed a timely notice of appeal. The matter was fully briefed and assigned to this panel in March 2025.

## DISCUSSION

Defendants argue the trial court erred in denying their petition to compel arbitration on the ground that they failed to carry their burden to establish the existence of a valid agreement to arbitrate the controversy. We see no reversable error.

I

*Relevant Legal Principles and Standard of Review*

A party to an arbitration agreement may seek a court order compelling the parties to arbitrate a dispute covered by the agreement. (Code Civ. Proc., § 1281.2.) "The validity of an arbitration agreement in California is determined by a petition or motion to compel arbitration." (*Juen v. Alain Pinel Realtors, Inc*. (2019) 32 Cal.App.5th 972, 977.) A petition to compel arbitration is essentially a suit in equity to compel specific

12

performance of the arbitration agreement.  (*Spear v. California State Auto. Assn*. (1992) 2 Cal.4th 1035, 1040.)  " 'The trial court must determine in advance whether there is a duty to arbitrate the controversy. . . .  This determination "necessarily requires the court to examine and, to a limited extent, construe the underlying agreement." ' "  (*Gravillis v. Coldwell Banker Residential Brokerage Co*. (2006) 143 Cal.App.4th 761, 770-771.)

A trial court must grant a petition to compel arbitration only "if it determines that an agreement to arbitrate the controversy exists."  (Code Civ. Proc., § 1281.2;[8] see also *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59 (*Avery*) [ " ' "the trial court's first task is to determine whether the parties have in fact agreed to arbitrate the dispute" ' "].)  The trial court makes this determination using a summary procedure in the manner "for the making and hearing of motions."  (Code Civ. Proc., § 1290.2.)  "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination."  (*Engalla v. Permanente Medical Group, Inc*. (1997) 15 Cal.4th 951, 972.)  "The [party seeking arbitration] bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and [the opposing party] bears the burden of proving by a preponderance of the evidence any fact necessary to its defense."  (*Ibid*.; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*); *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 764.)

---

[8]  Section 1281.2 provides:  "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists."  The section includes exceptions not relevant to this case.  (See § 1281.2, subds. (a)-(d).)

"Whether the parties formed a valid agreement to arbitrate is determined under general California contract law." (*City of Vista v. Sutro & Co*. (1997) 52 Cal.App.4th 401, 407.) "Even when an agreement provides that it is governed by the FAA, courts must first apply state law principles in determining whether the parties entered into an agreement to arbitrate." (*Garcia v. Stoneledge Furniture LLC* (2024) 102 Cal.App.5th 41, 51; see *Pinnacle, supra,* 55 Cal.4th at p. 236 ["In California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate' "]; *Banc of California, National Assn. v. Superior Court* (2021) 69 Cal.App.5th 357, 366 ["Whether there is a written agreement to arbitrate 'is a matter of contract, and courts must enforce arbitration contracts according to their terms' "].) "As with any other specific performance claim, a party seeking to enforce an arbitration agreement must show the agreement's terms ' "are sufficiently definite to enable the court to know what it is to enforce." ' " (*Avery*, supra, 218 Cal.App.4th at p. 71.) " ' "Only the valid and binding agreement of the parties, including all material terms well-defined and clearly expressed, may be ordered specifically performed." ' " (*Ibid*.)

While public policy favors contractual arbitration of disputes, arbitration is a matter of contract and a party who has not agreed to arbitrate a controversy cannot be compelled to do so. (*Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1057 [the public policy favoring contractual arbitration does not apply to those who are not a party to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that they have not agreed to resolve by arbitration]; *Avery, supra*, 218 Cal.App.4th at p. 59 [courts will not infer that the right to a jury trial has been waived absent a clear agreement between the parties for the arbitration of disputes]; see also *Laymon v. J. Rockcliff, Inc*. (2017) 12 Cal.App.5th 812, 820 [noting that the contractual terms must be carefully examined before the parties to the contract can be ordered to arbitration].) Thus, a court, before granting a petition to compel arbitration, " '*must* determine the factual issue of "the existence or validity of the

14

arbitration agreement." ' " (*Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 590.)

" 'An "arbitration agreement is subject to the same rules of construction as any other contract . . . ." ' " (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1221.) " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citations.] 'If contractual language is clear and explicit, it governs.' " (*State of California v. Continental Ins. Co*. (2012) 55 Cal.4th 186, 195.)

" ' " '[T]he parties may incorporate by reference into their contract the terms of some other document. . . . But each case must turn on its facts. For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' " ' " (*Remedial Construction Services, LP v. AECOM, Inc*. (2021) 65 Cal.App.5th 658, 663; *Avery, supra*, 218 Cal.App.4th at p. 66.) "The party seeking to enforce an arbitration provision incorporated by reference must establish the provision it seeks to enforce is the same provision to which the parties agreed." (*Avery*, at p. 67.)

"For any contract, the parties' consent is a basic element. [Citation.] In addition, the parties' consent must be communicated to one another. [Citation.] Thus, a party's consent is essential to 'the contractual underpinning of the arbitration procedure . . . .' [Citation.] '[T]he asserted absence of contractual consent renders arbitration, by its very definition, inapplicable to resolve the issue.' " (*Toal v. Tardif, supra,* 178 Cal.App.4th at p. 1221.) " ' " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." ' " (*Mendoza v. Trans Valley Transport, supra,*75 Cal.App.5th at p. 777.) " 'Consent is not mutual,

15

unless the parties all agree upon the same thing in the same sense.' [Citation.] Indeed, '[t]he parties' outward manifestations must show that the parties all agreed "upon the same thing in the same sense." [Citation.] If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation.' " (*Avery, supra*, 218 Cal.App.4th at p. 67.) In the context of arbitration agreements, "it is not sufficient for the party seeking to compel arbitration to show the parties generally agreed to arbitrate their disputes by incorporating some arbitration provision into their contract. Rather, the party must establish the precise arbitration provision the parties incorporated into their agreement to govern their disputes." (*Id*. at p. 68.)

"A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact [citation] or be effectuated by delegated consent [citation]. An arbitration clause within a contract may be binding on a party even if the party never actually read the clause." (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

Although the burden of persuasion is always on the moving party to prove the existence of a valid agreement to arbitrate the controversy, the burden of production may shift in a three-step process. (*Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 164-165 (*Gamboa*).) "First, the moving party bears the burden of producing 'prima facie evidence of a written agreement to arbitrate the controversy.' " (*Id.* at p. 165.) "The arbitration proponent must first recite verbatim, or provide a copy of, the alleged agreement." (*Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 755; Cal. Rules of Court,[9] rule 3.1330.)[10] The moving party can meet its initial burden " 'by

---

[9] Further rule references are to the California Rules of Court.

[10] In relevant part, Rule 3.1330 provides: "A petition to compel arbitration . . . must state . . . the provisions of the written agreement and the paragraph that provides for

16

attaching a copy of the arbitration agreement purportedly bearing the opposing party's signature.' " (*Iyere*, at p. 755; *Gamboa*, at p. 165.) "At this step, a movant need not 'follow the normal procedures of document authentication' and need only 'allege the existence of an agreement and support the allegation as provided in rule [3.1330].' " (*Iyere*, at p. 755.)

"If the moving party meets its initial prima facie burden and the opposing party disputes the agreement, then in the second step, the opposing party bears the burden of producing evidence to challenge the authenticity of the agreement. [Citation.] The opposing party can do this in several ways. For example, the opposing party may testify under oath or declare under penalty of perjury that the party never saw or does not remember seeing the agreement, or that the party never signed or does not remember signing the agreement." (*Gamboa, supra*, 72 Cal.App.5th at p. 165.)

But the need to raise a defense to enforcement arises only if the moving party first meets its burden of proving the existence of an arbitration agreement between the parties. This is so because "the existence of [an arbitration] agreement is a statutory prerequisite to granting [a] petition" to compel arbitration, which imposes on the moving party "the burden of proving [the agreement's] existence by a preponderance of the evidence," regardless of the opposing party's claimed defenses. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 (*Rosenthal*); *West v. Solar Mosaic LLC* (2024) 105 Cal.App.5th 985, 992 (*West*); *Gamboa, supra*, 72 Cal.App.5th at pp. 164-165.)

"If the opposing party meets its burden of producing evidence, then in the third step, the moving party must establish with admissible evidence a valid arbitration agreement between the parties. The burden of proving the agreement by a preponderance

arbitration. The provisions must be stated verbatim or a copy must be physically or electronically attached to the petition and incorporated by reference."

17

of the evidence remains with the moving party." (*Gamboa, supra*, 72 Cal.App.5th at pp. 165-166; see *Rosenthal, supra*, 14 Cal.4th at p. 413.)

" ' " 'When, as here, the court's order denying a motion to compel arbitration is based on the court's finding that [the moving party] failed to carry its burden of proof [with respect to the ultimate question of whether an agreement to arbitrate exists], the question for the reviewing court is whether that finding is erroneous as a matter of law. [Citations.] " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " ' [Citation.] ' " '[U]nless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence.' " [Citation.] "The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment. [Citation.] ' "All conflicts, therefore, must be resolved in favor of the respondent." ' " ' " (*West, supra*, 105 Cal.App.5th at p. 993; *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066-1067.)

Under well-established principles of California's constitutional doctrine of reversible error, an order of the lower court is *presumed correct*--that is, all intendments and presumptions are indulged to support it on matters as to which the record is silent-- and the appellant must affirmatively demonstrate prejudicial error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 .) It is the appellant's burden to overcome the presumption of correctness by demonstrating, on the basis of the record presented to the court, error requiring reversal. (*Jameson,* at p. 609.)

## II

### *Order Denying Petition to Compel Arbitration*

As we have set forth above, pursuant to a court order issued after the petition to compel arbitration was filed, defendants identified the specific arbitration provisions they sought to enforce against plaintiff--the arbitration provisions "corresponding" to the CNA union health care plan for the years 2017-2020, and the arbitration provision "corresponding" to the self-funded health care plan for 2020. As for the union health care plan, defendants explained that the applicable arbitration provisions were located in each year's (2017-2020) evidence of coverage document. Defendants further explained: "Employees sign one enrollment form when they first join the plan (such as when they are hired) and remain enrolled year after year. The employer-group (in this case the union) formally renews the group agreement every year. Here, Plaintiff's mother signed an enrollment form in 2004 and a change-of-beneficiary form in 2005 containing arbitration disclosures giving notice of the arbitration provision in the [Evidence of Coverage document]."

However, as the trial court observed, while the arbitration disclosure in the 2004 enrollment form stated that "the full arbitration provision" was contained in the evidence of coverage document, defendants never submitted that document to the court. As for the 2005 enrollment form that added plaintiff as a dependent under her mother's union health care plan, it *did not* reference the evidence of coverage document. Instead, the arbitration disclosure in that form referenced "the provisions of the Service Agreement and Health Plan policies," none of which were submitted to the trial court. And there was no evidence showing that plaintiff or her mother expressly agreed to the specific arbitration provisions defendants sought to enforce in the union health care plan membership agreements (2017-2020), the language of which changed over time. Indeed, defendants did not produce any arbitration agreement containing the signature of plaintiff's mother.

As for the 2020 self-funded plan, defendants relied on the terms set forth in the *Benefits Booklet* as evidence of an agreement to arbitrate the controversy. In so doing, defendants cited the arbitration disclosure language from the electronic form plaintiff's mother completed in 2020 when she enrolled in the self-funded plan. However, as the trial court pointed out, the arbitration disclosure included in the enrollment form stated that "the full arbitration provision" was contained in the "Evidence of Coverage" and/or the "Summary Plan Description." The arbitration disclosure makes no reference to the Benefits Booklet. And the record demonstrates that the Benefits Booklet, Evidence of Coverage, and summary plan description are distinct and separate documents. Defendants, for their part, do not point to anything in the record showing that plaintiff or her mother expressly agreed to the full arbitration agreement set forth in the Benefits Booklet.

On this record, we discern no basis for reversal. Defendants did not submit a copy of any arbitration agreement containing the signature of plaintiff's mother. (See *Iyere v. Wise Auto Group, supra*, 87 Cal.App.5th at p. 755 [a party seeking arbitration can carry its initial prima facie burden " 'by attaching a copy of the arbitration agreement purportedly bearing the opposing party's signature' "]; Rule 3.1130 [same].) Instead, defendants submitted only evidence showing that plaintiff's mother signed health care enrollment forms in 2004 and 2005 for the CNA union health care plan and completed an online enrollment form in 2020 for the self-funded health care plan. While each of those enrollment forms contained an arbitration *disclosure*, they all stated or indicated that the "full arbitration provision" was contained in a separate document--e.g., evidence of coverage, service agreement, summary plan description. None of those respective documents for the relevant years (2004, 2005, 2020) were provided to the trial court. And while defendants' petition to compel arbitration stated verbatim the language of the arbitration provision contained in the 2017 evidence of coverage document and the arbitration provision contained in the 2020 Benefits Booklet, the petition did not state

20

verbatim the "full" arbitration provision in the specific documents referenced in the 2004, 2005, and 2020 enrollment forms completed by plaintiff's mother. (See Rule 3.1330 [a party seeking arbitration can satisfy its initial prima facie burden by stating verbatim "the provisions of the written agreement and the paragraph that provides for arbitration"].) And notably, as the trial court observed, defendants concede that the terms of the arbitration provision in the relevant yearly membership agreements changed over time. Under the circumstances presented, the trial court did not err in denying the petition to compel arbitration. (See *Avery, supra*, 218 Cal.App.4th at p. 68 ["[I]t is not sufficient for the party seeking to compel arbitration to show the parties generally agreed to arbitrate their disputes by incorporating some arbitration provision into their contract. Rather, the party must establish the precise arbitration provision the parties incorporated into their agreement to govern their disputes"]; see *id*. at p. 69 [incorporation by reference requires the parties' contract to clearly and unequivocally identify the document being incorporated, and it is the terms in that specific document to which the parties agree].)

We find no merit in the various arguments defendants raise on appeal. Initially, we reject defendants' suggestion that the trial court erred by insisting that they prove the existence of a valid agreement to arbitrate the controversy. As noted *ante*, this is a statutory prerequisite to granting a petition to compel arbitration and must be established by a preponderance of the evidence, *regardless* of the opposing party's claimed defenses. (*Rosenthal, supra*, 14 Cal.4th at p. 413; *Engalla v. Permanente Medical Group, Inc., supra*, 15 Cal.4th at p. 972; *West, supra,* 105 Cal.App.5th at p. 992; see Code Civ. Proc., § 1281.2 [arbitration shall be ordered only if the court determines that an agreement to arbitrate the controversy exists].) We also reject defendants' undeveloped arguments concerning the 2020 self-funded plan, which defendants insist contains an arbitration provision that "covers" the medical malpractice claims alleged in the operative complaint. In defendants' view, the trial court erred in concluding that they failed to satisfy their burden of proof for two reasons: (1) the "document the full arbitration

agreement was contained in is *beside the point* because the *arbitration disclosure* [set forth in the enrollment form for the 2020 self-funded plan] . . . suffices to require Plaintiff to arbitrate her claims"; and (2) there was no dispute that plaintiff's mother was provided the Benefits Booklet in connection with her enrollment in the 2020 self-funded plan, which contained the full arbitration agreement. Because these conclusory contentions are not supported by citation and application of pertinent authority showing how and why the trial court erred, defendants have failed to carry their burden to affirmatively demonstrate reversible error. (*Siskiyou Hospital v. County of Siskiyou* (2025) 109 Cal.App.5th 14, 39; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153; *In re S.C.* (2006) 138 Cal.App.4th 396, 408.) As a result of defendants' deficient briefing, no further discussion of these issues is necessary.[11]

Equally without merit are defendants' arguments concerning the CNA union health care plan for the years 2017-2020. Citing cases that stand for the proposition that an agent or other fiduciary who contracts for medical treatment on behalf of its beneficiaries has the implied authority to agree to binding arbitration of malpractice claims arising from that treatment (e.g., *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706, 709 (*Madden*) and *Viola v. Dept. of Managed Health Care* (2005) 133 Cal.App.4th 299, 311-312), defendants claim that arbitration of this matter is required because they submitted the full arbitration agreement contained in the evidence of coverage document for the years 2017-2020. In defendants' view, the trial court was

---

[11] As for the merits, we note that the *Avery* court rejected an argument similar to one of the arguments defendants make here. In *Avery*, the parties seeking to compel arbitration sought to enforce language in two employment-related forms as stand-alone arbitration agreements. The court declined to do so because, although the forms expressed an intent to arbitrate all disputes between the parties, both forms incorporated another document by reference containing the arbitration policy. (See *Avery, supra*, 218 Cal.App.4th at pp. 56-57, 70 [explaining that, without the incorporated document, it could not determine the terms under which any arbitration must be conducted].)

"mistaken" when it stated that there was "no evidence or explanation as to how, why, or if [plaintiff's] mother's union could somehow bind [plaintiff] to the" 2017-2020 union agreements when those arbitration agreements are "not signed." According to defendants, mother's membership in the CNA union, together with the union's payment of premiums and plaintiff's (and mother's) acceptance of health care and other benefits, was sufficient to bind plaintiff to each of the union-plan arbitration agreements for the years 2017-2020. But defendants never made that specific argument in their petition to compel arbitration or in their reply papers. Nor did defendants raise the argument in their court-ordered supplemental brief, even though the trial court directed them to "specifically state which of the many arbitration provisions cited in their petition that they were seeking to enforce and why." Accordingly, because this argument was not raised and developed in defendants' written filings below, it is not preserved for appeal.[12]

---

[12] Defense counsel's statements at oral argument were insufficient to avoid forfeiture. There, counsel for the first time mentioned *Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699 and *Viola v. Department of Managed Health Care*, *supra*, 133 Cal.App.4th 299. Citing those cases, counsel claimed that, under the circumstances presented, California law does not require a separate arbitration agreement signed by plaintiff's mother, and that the CNA union had the authority (as mother's agent) to agree to arbitrate on her behalf, including agreeing to any changes in the arbitration agreement in the yearly health care membership agreements.

We recognize that appellate courts may consider an issue in the first instance when it raises a question of law on undisputed facts. (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44.) But even if we assume that the forfeited issue qualifies for such consideration, there is no rule that "an appellate court *must* consider a pure question of law raised for the first time on appeal. Instead, the decision to do so or not 'is largely a question of the appellate court's discretion.' " (*Souza v. Westlands Water Dist*. (2006) 135 Cal.App.4th 879, 898-899.) Our Supreme Court has cautioned that such discretion should be exercised rarely and only in cases presenting an important legal issue. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on unrelated grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; see *Wisner*, p. 44 [in anti-SLAPP case, declining to reach argument that causes of action were based on other, unprotected activity, where the argument was raised for the first time on appeal and thus not

We decline to consider the argument because it would be unfair to the trial court and contrary to principles of judicial economy to do so. (Cf. *Rancho Pauma Mutual Water Co. v. Yuima Municipal Water Dist.* (2015) 239 Cal.App.4th 109, 118-119 ["Alluding to an issue . . . during oral argument" in the trial court "in a case involving numerous documents is insufficient to preserve the issue" for appeal]; *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 172, fn. 17 [litigants "preserved [an] issue for appellate review, if only barely," where, in addition to a comment on that issue during oral argument in the trial court, they argued the issue in a request for judicial notice made in connection with a responsive pleading].)[13]

In sum, we conclude defendants have not carried their burden on appeal to affirmatively demonstrate reversible error. Defendants have not shown that the evidence presented in the proceedings below required the trial court, as a matter of law, to find that a valid agreement to arbitrate the controversy existed. (*West*, *supra*, 105 Cal.App.5th at p. 993; *Fabian v. Renovate America, Inc., supra*, 42 Cal.App.5th at pp. 1066-1067.)[14] Accordingly, we will affirm the challenged order.

---

"developed before, nor considered or ruled upon by, the trial court"]; *Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872-873 [it would be manifestly unjust to the opposing parties, unfair to the trial court, and contrary to judicial economy to permit a change of theory on appeal].)

[13] Defendants' unsuccessful attempt to raise the argument in their motion for reconsideration does not avert forfeiture. The trial court denied the motion on the ground that defendants failed to identify any new or different facts, circumstances, or law justifying reconsideration of the order denying their petition to compel arbitration. Defendants do not challenge the merits of that ruling on appeal.

[14] In light of our conclusion, we need not and do not consider any of the other arguments raised by the parties.

## DISPOSITION

The order denying the petition to compel arbitration is affirmed.  Plaintiff is entitled to her costs on appeal.  (Rule 8.278(a).)

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Hull, Acting P. J.

_____/s/_____
Robie, J.